# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN MILLINER,

                Plaintiff,

    v.

DAVID DIGUGLIELMO, et al.,

                Defendants.

CIVIL ACTION

No. 08-4905

## MEMORANDUM

Plaintiff John Milliner, a prisoner incarcerated at the Pennsylvania State

Correctional Institution at Graterford ("SCI-Graterford"), has filed an action under 42

U.S.C. § 1983, alleging that numerous defendants were deliberately indifferent to his

medical needs in violation of the Eighth and Fourteenth Amendments to the United States

Constitution. Milliner's Third Amended Complaint ("the complaint") also includes state-

law claims for medical malpractice and common law negligence.[1] The complaint alleges,

as a general matter, that Milliner severely injured his back when he fell from the top bunk

of his cell and that he received inadequate medical care for the pain and complications

---

[1] Milliner filed a pro se complaint on October 14, 2008, dkt. 1, and successive
amended complaints on July 31, 2009, dkt. 18, and then again on September 4, 2009, dkt.
31. On September 30, 2009, the court granted Milliner's request for appointment of pro
bono counsel. Dkt. 37. Finally, on August 6, 2010, Milliner, through his counsel, filed
the Third Amended Complaint. Dkt. 62.

1

resulting from that fall. Milliner further alleges that he underwent a flawed spinal surgery that left him temporarily paralyzed from the neck down.

Before the court are motions to dismiss Milliner's complaint, filed on behalf of (1) defendants David DiGuglielmo, Julie Knauer, and Myron Stanishefski ("the Administrative Defendants"), dkt. 64; (2) Raymond Machak, P.A., John Zaro, M.D., Richard Stefanic, M.D., Caleb Nwosu, D.O., and Prison Health Services, Inc. ("the Medical Defendants"), dkt. 66; and (3) defendants Caroll Osgood, M.D., and Altoona Hospital ("the Altoona Defendants"), dkt. 78. Milliner has filed responses to each of these motions.

## I.

Factual Background[2]

In October of 2006, Milliner—an inmate at SCI-Graterford—fell awkwardly from the top bunk of his cell. The fall caused him extreme pain in his lower back and other parts of his body. Over the course of the next year, Milliner was seen by several doctors and a physician's assistant. He was prescribed various pain-relief medications and he eventually underwent an MRI. The MRI revealed "several cervical disc herniations, protrusions, and bulges as well as significant compression of the cervical spinal cord and possible edema on and myleomalacia of the cord itself." Compl. ¶ 41.

---

[2] In reciting the factual background, the court must take as true all well-pleaded factual allegations together with reasonable inferences that may be drawn therefrom. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).

Based on this MRI, Milliner was referred to a neurosurgeon at Altoona Hospital, Dr. Carroll Osgood. Compl. ¶ 42. Dr. Osgood performed a flawed spinal surgery on Milliner and, "[a]s a result of the surgery, Plaintiff was left completely paralyzed from the neck down." Compl. ¶ 44. Milliner was eventually able to regain movement in some parts of his body.

In the year and a half following this "botched" surgery, Milliner received substandard care. He was initially housed in an institution that was not equipped to handle his post-surgical treatment, and even after he was transferred to a better-equipped institution, he continued to receive inadequate care. On March 26, 2009, it was recommended that Milliner undergo a second surgery. Throughout the course of Milliner's ordeal, he submitted several grievances to the prison's administrators, but all grievances were denied. As a result of the inadequate treatment described above, Milliner suffers from several disabilities, including: a lack of full range of motion with all of his limbs, constant numbness in both hands, loss of balance, chronic pain, convulsions, and an inability to perform everyday tasks.

On October 14, 2008, Milliner filed a civil rights action in this court. The operative complaint alleges that the defendants' acts and omissions amounted to (1) deliberate indifference to his serious medical needs, (2) medical malpractice, and/or (3)

ordinary negligence.[3]  The following sections address the specific claims leveled against each defendant.

## II.

### Standard of Review under Rule 12(b)(6)

In order to survive a motion to dismiss for failure to state a claim, a complaint need only include "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Thus plaintiffs must include "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). In reviewing a 12(b)(6) motion, "the facts alleged [in the complaint] must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  Reasonable inferences must be drawn in

---

[3] The ten counts of the complaint are as follows: I – deliberate indifference as against the Administrative Defendants; II – deliberate indifference as against the individual Medical Defendants; III – deliberate indifference as against PHS; IV – medical malpractice as against the individual Medical Defendants; V – corporate liability for medical malpractice as against PHS; VI – vicarious liability for medical malpractice as against PHS; VII – medical malpractice as against Dr. Osgood; VIII – corporate liability for medical malpractice as against Altoona Hospital; IX – vicarious liability for medical malpractice as against Altoona Hospital; X – negligence as against all defendants.

favor of the plaintiff. *Id.*

Deliberate indifference to medical needs

"Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 182–83) (citation omitted)). This standard "requires deliberate indifference on the part of the prison officials and it requires the prisoner's medical needs to be serious." *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978).[4] Deliberate indifference is established where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). But "negligence in the administration of medical treatment to prisoners is not itself actionable under the Constitution . . . ." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979); *see also Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F. 2d 326, 346 (3d Cir. 1987) ("[M]ere allegations of malpractice do not raise issues of constitutional import."). Moreover, "[c]ourts will 'disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional

_____

[4] None of the defendants disputes that Milliner has alleged that his medical needs were serious. The thrust of defendants' argument is that the complaint fails to allege that the defendants were deliberately indifferent to those medical needs.

judgment.'" *Id.* (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

The deliberate indifference standard is met under a variety of circumstances, including (1) where "prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury," (2) "where knowledge of the need for medical care [is coupled with] . . . intentional refusal to provide that care," (3) where "prison officials . . . , with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition," and (4) where "necessary medical treatment is delayed for non-medical reasons." *Lanzaro*, 834 F.2d at 346 (internal quotation marks omitted).

Medical Malpractice

To state a claim for medical malpractice under Pennsylvania law, a plaintiff must show (1) a duty owed to a patient by a physician; (2) a breach of that duty by the physician; (3) the breach of that duty was the proximate cause of, or a substantial factor in bringing about the harm suffered; and (4) the damages suffered by the patient were a direct result of the harm. *Quinby v. Plumsteadville Family Practice*, 907 A.2d 1061, 1070 (Pa. 2006).

The Pennsylvania Supreme Court has described the applicable standards of care, for specialists and non-specialists, as follows:

A physician who is not a specialist is required to possess and employ in the treatment of a patient the skill and knowledge usually possessed by physicians

6

in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man.

The standard of care for a specialist acting within his or her specialty is higher. He or she is expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of diseases within the specialty.

*Joyce v. Boulevard Physical Therapy & Rehab. Ctr., P.C.*, 694 A.2d 648, 654 (Pa. 1997)

(internal quotation marks omitted).

Negligence

Unlike a medical malpractice claim, "claims of ordinary negligence . . . raise issues that are *within the common knowledge and experience of the fact-finder*." *Smith v. Friends Hosp.*, 928 A.2d 1072, 1075 (Pa. Super. 2007). "Therefore, a court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Id.*

**IV**.

The Medical Defendants[5]

---

[5] Milliner properly specifies that he sues the defendants in their official capacities for declaratory and prospective injunctive relief, and in their individual capacities for monetary relief. *Helfrich v. Pa. Dep't of Military Affairs*, 660 F.2d 88, 90 (3d Cir. 1981) (per curiam).

The Medical Defendants include Raymond Machak, Dr. John Zaro, Dr. Richard Stefanic, Dr. Caleb Nwosu, and Prison Health Services, Inc. ("PHS"). All of the individual Medical Defendants worked at SCI-Graterford and contracted with the Department of Corrections and/or PHS. PHS contracted with the Department of Corrections to provide health care services to inmates. Compl. ¶ 9.

Milliner alleges that all of the individual Medical Defendants are liable under theories of deliberate indifference, medical malpractice, and ordinary negligence.[6] He alleges that PHS is also liable for deliberate indifference, and under the state-law doctrines of corporate negligence and vicarious liability.

## A. Raymond Machak

According to the complaint, Machak is "responsible for providing medical care to inmates and/or aiding physicians with medical care of inmates." Compl. ¶ 6. As a physician's assistant, Machak appears to serve as a "first responder" who visits an inmate anytime the inmate puts in a "sick call request." The complaint alleges that Machak responded to at least four of Milliner's sick call requests. *See* Compl. ¶¶ 20, 23, 27, 31. After the first visit, Machak prescribed fourteen days worth of pain medication. The

_____

[6] The sufficiency of the state law claims is not disputed by the individual Medical Defendants. *See, e.g.*, dkt. 66 (Medical Defendant's Opp'n) at 11 (plaintiff "submits averments that rise to the level of negligence only"); *id.* at 27 (arguing that case should be remanded to state court for resolution of state law claims). Accordingly, the medical malpractice and negligence claims will remain intact and this memorandum will address only the individual Medical Defendants' contention that the complaint fails to state a federal claim under the Eighth Amendment.

medication was discontinued after three days for unknown reasons not attributed to Machak. After the second visit, Machak placed Milliner on the list for a doctor's appointment. The complaint does not state what action, if any, was taken after the third and fourth visits, except to state that, on those two occasions, Machak failed to conduct a physical exam or to put Milliner on the list to be seen by a doctor.

Milliner stresses Machak's failure, on all four sick calls, to physically examine Milliner. By itself, however, that omission is insufficient to demonstrate deliberate indifference. Machak visited Milliner's cell one to two days after each request. He prescribed medication after the first request, and referred Milliner to a doctor after the second request. Moreover, although Machak did not refer Milliner to a doctor after the third and fourth sick calls, Milliner was already being seen by various physicians periodically around the time of the third and fourth calls. Given that Machak was responsive to Milliner's complaints and that Milliner was receiving considerable attention from physicians, Machak's failure to physically examine does not amount to deliberate indifference. Instead it amounts to a mere disagreement with the extent of review provided by Machak. Accordingly, the federal claims will be dismissed, without prejudice, as to Machak.

**B. Dr. John Zaro**

Dr. Zaro—the first physician to assess Milliner's condition—saw Milliner on November 6, 2006. The complaint alleges that "Dr. Zaro stated to Plaintiff that his

continued pain was the result of arthritis.  Dr. Zaro's arthritis determination was based upon his review of an X-ray of Plaintiff that was taken in March 2005, more than 1 ½ years before Plaintiff's injury on October 14, 2006."  Compl. ¶ 24.  Dr. Zaro then ordered ten days' worth of medication and advised Milliner that he would follow-up within a five-week period.  But neither Dr. Zaro nor any other physician saw Milliner within five weeks.  After Milliner submitted another sick call request, Dr. Zaro saw Milliner on December 28, 2006, approximately seven weeks after Dr. Zaro's first visit.  During that visit, Milliner complained of recurrent back pain, but Dr. Zaro did not conduct a physical exam or order a follow-up visit.  Instead, Dr. Zaro "focused on the results of recent laboratory tests."  Compl. ¶ 29.

These allegations, taken as true, are sufficient to state a claim against Dr. Zaro for deliberate indifference.  First, because Dr. Zaro directly treated Milliner for his back pain, it can reasonably be inferred that Milliner informed Dr. Zaro of the perceived cause of that pain—i.e., his fall from the bunk on October 14, 2006.  Dr. Zaro's subsequent decision to rely on an X-ray that pre-dated Milliner's fall indicates that Dr. Zaro opted for "easier and less efficacious treatment" in violation of the Eighth Amendment.  *Lanzaro*, 834 F.2d at 346.  Second, the fact that Dr. Zaro decided that follow-up within five weeks was necessary, coupled with the fact that he did not follow-up until seven weeks later, suggests that "necessary medical treatment [was] delayed for non-medical reasons."  *Id.* at

346. Accordingly, Dr. Zaro's motion to dismiss will be denied.[7]

## C. Dr. Richard Stefanic

Dr. Stefanic is a "senior physician" who is "responsible for providing medical care to inmates, reviewing inmate medical records, and supervising medical personnel." Compl. ¶ 5. Dr. Stefanic was not directly involved in Milliner's care until after Milliner's "botched" surgery. The primary allegation against Dr. Stefanic is that he scheduled a post-surgery consultation with Dr. Osgood, despite Milliner's "contention that Dr. Osgood's surgical intervention was flawed and constituted medical malpractice." Compl. ¶ 58. This allegation is insufficient to state a claim for deliberate indifference. Nothing in the complaint suggests that Dr. Stefanic used anything other than sound medical

---

[7] Dr. Zaro and the other Medical Defendants assert that Milliner's § 1983 claims must fail because he has not sufficiently alleged causation. A plaintiff alleging an Eighth Amendment violation "must . . . show that the harm he suffered was caused by a prison official's deliberate indifference to his safety." *Hamilton v. Leavy*, 117 F.3d 742, 747 (3d Cir. 1997). Thus, "showing that there was an excessive risk to [a plaintiff's] safety is alone insufficient . . . ." *Id.*

The complaint alleges that "[a]s a direct and proximate result of the aforesaid acts and omissions of [the Medical] Defendants, Plaintiff suffered and will continue to suffer from spinal cord damage and pain associated with nerve damage and disc herniation." Compl. ¶ 86. This bare allegation is insufficient to state causation. But with regard to Dr. Zaro, at least, other factual allegations are sufficient to state causation. Specifically, and as discussed above, Milliner has alleged that Dr. Zaro misdiagnosed him twice and also that Dr. Zaro delayed necessary treatment for non-medical reasons. It can reasonably be inferred from those allegations that Dr. Zaro's actions caused at least some of the pain and nerve damage suffered by Milliner. Consequently, Milliner has adequately alleged causation with respect to Dr. Zaro. (The court need not reach the question of causation as to the other individual Medical Defendants because the federal claims against them will be dismissed on other grounds.)

judgment in deciding that Milliner should see Dr. Osgood. And it is sensible to recommend that post-surgical follow-up be conducted by the physician who performed the surgery. Though Milliner told Dr. Stefanic that he considered Dr. Osgood's surgery to constitute malpractice, it is unclear what else, if anything, Milliner told Dr. Stefanic. Without more, the court cannot find that Dr. Stefanic's decision to order a follow up consultation with Dr. Osgood shows that he "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Accordingly, the federal claims will be dismissed, without prejudice, as to Dr. Stefanic.

**D. Dr. Caleb Nwosu**

The central allegation against Dr. Nwosu—who saw Milliner prior to his surgery—is that he "performed 'a soft tissue technique to 'crack' Plaintiff's neck which caused Plaintiff to be in even more pain." Compl. ¶ 35. Milliner takes issue with this treatment because it was performed "without the benefit of a diagnostic imaging study." Dkt. 75 (Pl.'s Opp'n) at 12. But the complaint does not explain why an imaging study is a pre-requisite to the treatment provided by Dr. Nwosu, and thus the complaint provides no basis for finding that Dr. Nwosu acted with deliberate indifference. *See Estelle*, 429 U.S. at 108 ("[T]he question whether an X-ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment.").

Milliner also takes issue with the type of X-ray that Dr. Nwosu eventually did order. After performing the soft tissue technique, Dr. Nwosu ordered an X-ray of

Milliner's cervical spine. Comp. ¶ 35. Milliner seems to contend that, because he was suffering from "radiating pain and inability to move his right arm," the X-ray should have focused on a different part of his body. This disagreement does not state a claim for deliberate indifference. *Lanzaro*, 834 F.3d at 346. Accordingly, the federal claims will be dismissed, without prejudice, as to Dr. Nwosu.

**E. Prison Health Services ("PHS")**

The complaint states that PHS is a "Delaware corporation [that] contracted with the [Pennsylvania] Department of Corrections to provide health care services to inmates on behalf of the Department of Corrections." Compl. ¶ 9. The complaint presents both federal and state claims against PHS, all of which are discussed below.

      1. *Monell* Liability

      A private corporation, such as PHS, may be sued under § 1983 for actions taken under color of state law that deprive a prisoner of adequate medical care. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). Though it is undisputed that PHS was acting under color of state law, Milliner cannot hold PHS liable in *respondeat superior* (that is, based solely on the actions of its employees). *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, Milliner must demonstrate that a PHS policy, practice, or custom was causally related to his ultimate constitutional injury. *See Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005).

In *Natale*, the Third Circuit identified three methods of establishing a policy, practice, or custom:

> The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Bryan County*, 520 U.S. at 417 (Souter, J., dissenting).[8] The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Id.* Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 417–18 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).

*Natale*, 318 F.3d at 584.

Milliner argues that PHS can be held liable under the third theory—failure to act affirmatively—which the *Natale* court described as "turn[ing] a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights." *Id.* There are four failures—as articulated both in the complaint and in Milliner's brief[9]—that could state a claim for deliberate indifference against PHS.

      a. *Failure to require physicians' assistants to conduct physical examinations*

First, Milliner asserts that PHS failed to ensure that physician's assistants ("PAs")

---

[8] The *Natale* court cited Justice Souter's dissent "for its cogent and concise summary of the three situations in which a policy or custom sufficient to impose liability may arise, not its conclusion about the requisite evidentiary showing in those situations." *Id.* at 584 n.10.

[9] A plaintiff's brief may be used to "clarify allegations in her complaint whose meaning is unclear." *Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000).

conducted physical examinations when responding to sick call requests.[10] The court agrees that Machak's repeated failure to conduct physical examinations gives rise to an inference that PHS had a policy or custom of permitting PAs such as Machak to make initial assessments without physical examinations. But the court also finds that, on these facts, such a policy does not state a claim for deliberate indifference.

As discussed above, the complaint shows that, though Machak did not conduct physical examinations when responding to sick call requests, he was at least somewhat responsive to Milliner's condition. (After the first sick call, Machak prescribed medication, and after the second Machak put Milliner on a list to be seen by a doctor.) And, with certain exceptions, Milliner does not allege that the doctors who treated him failed to conduct physical exams. Given that Milliner received relatively prompt attention from physicians after his initial contacts with Machak, it cannot be said that PHS's custom was "obviously inadequate." Instead, as alleged by Milliner, PHS's custom appears, on these facts, to be a reasonable means of triageing inmate requests for medical assistance.

b. *Failure to ensure adequate post-surgical follow-up treatment*

Milliner also asserts that PHS failed to ensure adequate post-surgical care. Viewed through this lens, Milliner's claim against PHS must survive the motion to dismiss.

After Milliner underwent surgery at Altoona Hospital, he was left paralyzed from the

---

[10] As noted above, Machak responded to four sick call requests and failed to conduct a physical examination during any of his four visits.

neck down. Dr. Osgood stated that he would follow-up with Milliner, within one month, to take X-rays and to ensure that the disc had fused successfully. Compl. ¶ 45. But Milliner did not receive a subsequent neurological consult until one and a half years after the surgery. Compl. ¶ 63. Moreover, Dr. Osgood ordered plaintiff to be transferred to SCI-Laurel Highland for rehabilitation and physical therapy. Due to a bed space shortage, however, Milliner was sent to SCI-Smithfield, "despite the fact that the medical staff there had neither the training nor equipment needed for the specialized post-operative care required by plaintiff." Compl. ¶ 46.

Due to PHS's failure to ensure that Milliner received competent follow-up care, Milliner developed a "serious infection that resulted from fecal matter that was not properly cleaned by medical personnel at SCI-Smithfield." Compl. ¶ 48. This infection was discovered during his first post-surgery bath, which took place a full two weeks after his surgery. Compl. ¶ 48. Moreover, Milliner—in a state of complete physical paralysis—was unable to sleep for three weeks following surgery and endured "severe hallucinations" until he was prescribed psychotropic medication. Compl. ¶ 49.

If proven, the facts described above would demonstrate that Milliner received grossly inadequate post-surgical care. Though certain aspects of the deficient follow-up can be attributed to certain of the individual defendants (e.g., Dr. Osgood), the systemic deficiencies can fairly be construed as "a failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions [that] creates a risk that is sufficiently

obvious as to constitute deliberate indifference to those inmate's medical needs." *Natale*, 318 F.3d at 585; *see also Morton v. City of Philadelphia*, No. 09-4877, 2011 U.S. Dist. LEXIS 14796, at *24 (E.D. Pa. Feb. 15, 2011) (finding, at summary judgment, that "there is evidence of record for a reasonable jury to conclude that it became a custom at PHS that it had no procedures in place for the treatment and follow up of an inmate's orthopedic needs, ensuring consistent and adequate methods of communication among the physicians in securing that treatment, making certain that inmates' medical needs were followed by the medical staff, and making certain that physicians' orders were addressed").

### c. *Failure to make more than one neurosurgeon available*

Milliner argues that PHS's failure to make more than one neurosurgeon availabile to inmates was a deliberately indifferent practice. According to the complaint, Dr. Stefanic ordered that Milliner be seen by Dr. Osgood for post-surgical follow-up, despite the fact that Dr. Osgood had botched the surgery. Indeed, the complaint alleges that Stanishefski, one of the healthcare administrators, told Milliner that "Dr. Osgood performed all of the neurosurgery for the Department of Corrections." Compl. ¶ 62. Thus the complaint sufficiently alleges that PHS's practice is to have only one neurosurgeon available to treat inmates.

But on these facts, such a practice does not amount to deliberate indifference. There is no allegation that, prior to Milliner's complaints about Dr. Osgood, PHS had any knowledge that Dr. Osgood might be providing inadequate care. If, for example, PHS

17

maintained a policy of using only one neurosurgeon who had a demonstrated history of malpractice, such a policy might state a claim for deliberate indifference against PHS. Moreover, the complaint indicates that Milliner did see a different neurosurgeon—though after a lengthy delay—after he refused to see Dr. Osgood. *See* Compl. ¶ 63. Accordingly, PHS's practice of using only one neurosurgeon does not amount to deliberate indifference.

d. *Failure to ensure transfer to a single-bunk cell*

Though Milliner does not stress this issue in his briefing, the complaint makes it apparent that PHS failed to ensure that Milliner was promptly placed in a single-bunk cell. Before Milliner underwent the first surgery, his physical therapist (who is not named as a defendant), told Milliner that part of his chronic pain was due to being in a double-bunk cell that required him to bend his spine anytime he tried to sit up. Compl. ¶ 39. After the surgery and after months of rehabilitation, Milliner was again placed in a double-bunk cell which "forced him, in any attempt to sit up in bed, to bend his spine in a manner that exacerbated his injuries." Compl. ¶ 51. After bringing this to the attention of the medical department, Dr. Stefanic "notified the proper party in order to have Plaintiff placed in a cell that did not have a double bunk." Compl. ¶ 51. But Milliner was not transferred to a single-bunk cell until "several months" later, when a member of the Pennsylvania Prison Society advocated on Milliner's behalf. Compl. ¶ 52.

It can reasonably be inferred from these allegations that PHS did not have an adequate policy to address Milliner's need to be transferred to a single-bunk cell. In other words, the

complaint can fairly be construed as alleging that PHS "fail[ed] to establish a policy to address the immediate . . . needs of inmates with serious medical conditions [that] creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmate's medical needs." *Natale*, 318 F.3d at 585.; *see also Garafola v. Lackawanna Cnty.*, No. 3:07-2305, 2011 U.S. Dist. LEXIS 34556, at *31 (M.D. Pa. Mar. 31, 2011) (finding sufficient evidence to support allegation that "prison had a policy of not granting lower bunks to those who requested and needed them [for medical reasons]").

2. Corporate liability[11]

Milliner also alleges that PHS is liable for medical malpractice under a theory of corporate liability. In *Thompson v. Nason Hospital*, 594 A.2d 703 (Pa. 1991), the Pennsylvania Supreme Court "adopte[ed] as a theory of hospital liability the doctrine of corporate negligence or corporate liability under which the hospital is liable if it fails to uphold the proper standard of care owed its patient." *Id.* at 708. The Court identified the following four categories of a hospital's duties:

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

---

[11] The court construes this claim (Count V) as identical to the claim, contained in Count X, that PHS is liable for "negligence." As noted above, a hospital liability claim under *Thompson* is in essence a negligence action against the hospital itself. Thus, although PHS's motion to dismiss will be denied as to Count V, it will be granted as to Count X.

*Id.* at 707 (citations omitted).  As discussed above in assessing Milliner's *Monell* claim, he has sufficiently alleged that PHS has an unconstitutional custom or practice with regard to (1) ensuring adequate post-surgical treatment, and (2) ensuring a prompt transfer to a single bunk cell.  Thus, Milliner has also sufficiently alleged corporate liability for breach of the fourth *Thompson* duty—i.e., the failure to "adopt and enforce adequate rules and policies to ensure quality care for the patients."

Still, PHS argues that it cannot be held liable under the corporate liability doctrine because the *Thompson* rule is limited to entities that, like hospitals, "play central role[s] in the total health care" of their patients.  *Thompson*, 591 A.2d at 708.  This argument must be rejected, however, because Milliner has sufficiently alleged that PHS plays such a role.  Specifically, Milliner has alleged that PHS "contracted with the Department of Corrections to provide health care services to inmates . . . ,"Compl. ¶ 9, and that each individual medical defendant—who collectively provided a wide range of medical services—contracted with PHS.  Thus, it can reasonably be inferred that PHS plays a "central role" in the healthcare of inmates.  *See Wheeler v. Prison Health Servs., Inc.*, No. 09-410, 2010 WL 3489405, at *7 (E.D. Pa. Sept. 1, 2010) ("Considering decisions of the intermediate Pennsylvania courts, and the well-reasoned opinions of courts in the Eastern District, this court finds the Pennsylvania Supreme Court would extend corporate negligence to an institution responsible for an inmate's healthcare, like PHS." (citations omitted)).  Accordingly, PHS's motion to dismiss the corporate negligence claim will be denied.

### 3. Medical malpractice – vicarious liability

Milliner further alleges that PHS is vicariously liable for the malpractice of the individual Medical Defendants. "It is well settled that an employer is vicariously liable for the negligent acts of his employee which cause injuries to a third-party, provided that such acts were committed during the course of and within the scope of the employment." *Valles v. Albert Einstein Med. Ctr.*, 758 A.2d 1238, 1244 (Pa. Super. 2000). To trigger vicarious liability, a plaintiff must show "actual agency" or "ostensible agency." Actual agency exists where the employer has the "right or authority to interfere [with] or control" the work of the employee, *Feller v. New Amsterdam Cas. Co.*, 70 A.2d 299, 302 (Pa. 1950), whereas ostensible agency exists where the "services [of the independent contractor] are accepted in the reasonable belief that the services are being rendered by the employer or by his servants," *Simmons v. St. Clair Mem'l Hosp.*, 481 A.2d 870, 874 (Pa. Super. 1984).

Milliner's complaint is sufficient to state a claim that PHS is vicariously liable. Milliner has alleged that these individuals "were employed by, were consultants of, or were held out as employees of Defendant PHS and acted within the scope of said employment or consultancy." Compl. ¶ 107. Moreover, Milliner alleges that, "particularly with respect to timing and logistics of care, Defendant PHS exercised control over the Individual Medical Defendants." Compl. ¶ 108. Taking these allegations as true—and given that the sufficiency of the individual claims of medical malpractice are not disputed, *supra* note 5—Milliner has presented a plausible claim that PHS is vicariously liable for any malpractice committed by

the individual Medical Defendants.

The Administrative Defendants

In Count I, Milliner alleges that two health care administrators (Stanishefski and Knauer) and the superintendent of SCI-Graterford (DiGuglielmo), were deliberately indifferent to Milliner's medical needs. In Count X, Milliner alleges that these defendants were negligent.

The requisite showing in an Eighth Amendment claim differs somewhat when the claims are directed at non-medical, as opposed to medical personnel. In a suit against non-medical personnel, "[i]f a prisoner is under the care of medical experts . . ., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Thus, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* Moreover, where non-medical officials play a supervisory role over a plaintiff's treatment, "respondeat superior is, of course, not an acceptable basis for liability under § 1983." *Durmer v. O'Carroll*, 991 F.2d 64, 69 n.14 (3d Cir. 1993).

**A. Myron Stanishefski**

As a health care administrator, Stanishefski is "responsible for supervising medical personnel and planning, coordinating, and supervising health care services for inmates."

Compl. ¶ 4.  Milliner alleges that Stanishefski was personally involved in three separate incidents that demonstrate deliberate indifference.

First, on December 26, 2006, Milliner filed a grievance complaint—which was assigned to Stanishefski—stating "that he was not being given proper treatment for his condition and that he was still in serious pain."  Compl. ¶¶ 28, 32.  It appears that Milliner's primary complaint in the grievance was that, after seeing Dr. John Zaro on November 6, he did not receive sufficient or competent follow-up treatment.  On January 27, 2007, Stanishefski responded to the grievance by explaining that the reason Milliner had not received follow-up visits was "because Dr. Zaro failed to order a follow-up . . . ."  Compl. ¶ 36.  This allegation is insufficient to support a claim for deliberate indifference.  Instead, the allegation shows that Stanishefski, a non-medical official, deferred to the medical judgment of Dr. Zaro in determining whether and when to provide follow-up treatment.

Second, on June 20, 2008, Milliner filed another grievance "complaining about the lack of post-surgical treatment [because he] had not been seen for a post-operative neurological follow-up nor had he undergone post-operative medical imaging to determine if the surgical fusions had been successful."  Compl. ¶ 54.  Stanishefski denied this grievance on June 30, 2008, and "stat[ed] that a neurosurgical consult was ordered on June 26, 2008."  Compl. ¶55.  In other words, the complaint alleges that Stanishefski denied the grievance because it was mooted by the fact that a consult had already been

ordered.  Thus this allegation does not state a claim for deliberate indifference.

Third, Stanishefski denied a grievance concerning Milliner's objection to receiving further treatment from Dr. Osgood.  As discussed above, Milliner had objected to such treatment because he believed Osgood's prior surgery amounted to "malpractice." Compl. ¶ 62.  Stanishefski denied this grievance, "noting that Dr. Osgood performed all of the neurosurgery for the Department of Corrections."  Compl. ¶ 62.  This denial does not state a claim for deliberate indifference.  Instead, Milliner has simply alleged that Stanishefski denied the grievance because corrective action was precluded by PHS's practice—discussed in more detail above—of making only one neurosurgeon available to inmates.

In sum, Milliner has failed to state a claim for deliberate indifference against Stanishefski.  Nor do the allegations state a claim for negligence because, as described above, Stanishefki's actions and decisions were all reasonable under the circumstances. Accordingly, the complaint will be dismissed, without prejudice, as to Stanishefski.

**B. David Diguglielmo**

The only factual allegation against Diguglielmo is that he denied Milliner's appeal of Stanishefski's June 30, 2008, grievance dismissal.  Compl. ¶ 56.  But that grievance dismissal appears, at least on these facts, to have been justified because a neurosurgical consult had been ordered in the time between the grievance and Stanishefski's response to that grievance.  Accordingly, this individual allegation against Diguglielmo does not state

a claim for either negligence or deliberate indifference, and the complaint against him will be dismissed without prejudice.

## C. Julie Knauer

There are no factual allegations that refer to Knauer's individual conduct, and Milliner has thus failed to state a claim for negligence or deliberate indifference against Knauer. The complaint will thus be dismissed, without prejudice, as to Knauer.[12]

---

[12] In addition to the factual allegations discussed above, Count I lists various broad allegations that apply to all three defendants. In essence, these allegations assert that (1) Milliner received constitutionally inadequate medical care over the course of more than two years, and (2) all defendants were aware of the inadequacies and they deliberately chose not to remedy the inadequacies. If supported by well-pleaded facts, this theory of liability could be sufficient to withstand defendants' motion to dismiss. *See Lanzaro*, 834 F. 2d at 346. But Milliner's generalized claims fall short for two reasons.

First, Count I fails to specify how and when each *individual* defendant violated Milliner's constitutional rights. Instead, the allegations lump all three defendants together and state that they collectively failed to "ensure" that Milliner received adequate treatment. Because a § 1983 action must allege personal involvement, and because liability based on respondeat superior is impermissible, these generalized allegations are insufficient. *See Durmer*, 991 F.2d at 69 n.14.

Second, even if Count I did allege personal involvement, the allegations are insufficient to demonstrate deliberate indifference. For example, paragraph 72 asserts that the defendants should be liable because (1) they did not "require" the doctors to conduct physical exams in a timely manner and (2) they did not "require" the doctors to prescribe additional pain medication. Though it may be that the medical care was inadequate in these regards, the omissions complained of are in the realm of medical judgments and thus the non-medical defendants' failure to intervene cannot amount to deliberate indifference. *See Spruill*, 372 F.3d at 236. Similarly, in paragraph 73, Milliner asserts that the defendants failed to "ensur[e] that required surgery was performed until September 27, 2007, more than four months after discovery of Plaintiff's herniated disc and spinal cord injury." But again, the decision of whether or not to perform surgery, and of how soon to perform that surgery, amount to medical judgments. Accordingly, none of the allegations in Count I are sufficient to state a claim against the Administrative Defendants.

Altoona Hospital contracted with the Department of Corrections and/or PHS to provide medical services to inmates. Compl. ¶ 11. Dr. Osgood is a neurosurgeon at Altoona Hospital and he also contracted with the Department of Corrections and/or PHS. Compl. ¶ 10. In Counts VII and X, respectively, Milliner alleges that Dr. Osgood is liable for medical malpractice and negligence. In Counts VIII and XI, respectively, Milliner alleges that Altoona Hospital is liable under theories of corporate and vicarious liability.

## A. Dr. Caroll Osgood

### 1. Medical malpractice

Milliner argues that Dr. Osgood's "botched" surgery, and subsequent failure to provide timely follow-up treatment, amounted to medical malpractice. As noted above, "a specialist acting within his or her specialty is . . . expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of diseases within the specialty." *Joyce*, 694 A.2d at 654.[13] Here, breach of that standard of care is alleged on two separate grounds. First, Milliner alleges that Dr. Osgood stated that the "only possible side effects" of the surgery would include—among other more minor side effects—that Milliner would have partial paralysis of the right arm. Instead, as a result of

---

[13] It is undisputed that undertaking to conduct surgery on a patient imposes a duty of care.

the surgery, Milliner was left, albeit temporarily, "completely paralyzed from the neck down." Compl. ¶ 44. Milliner further alleges that "after the surgery Dr. Osgood stood over top of Plaintiff yelling at Plaintiff because Plaintiff could not squeeze the doctor's fingers or wiggle his toes." Compl. ¶ 44. Second, Milliner alleges that Dr. Osgood stated that "he would see Plaintiff within a month for X-rays and a follow-up to make sure that the disc on which he operated had fused successfully." Compl. ¶ 45. But the complaint indicates that Dr. Osgood performed no such follow-up.

Both of these alleged deficiencies in Dr. Osgood's performance are sufficient to show that Dr. Osgood breached his duty of care to Milliner. First, it is plausible that the performance of a surgery that results in complete paralysis—where paralysis of the right arm was the most severe anticipated side effect—could demonstrate a failure to "exercise the degree of skill, learning and care normally possessed" by the average neurosurgeon. And the allegation that Dr. Osgood stood over Milliner after the surgery and yelled at him would constitute a similarly deficient exercise of care. Second, the recognition that a patient must be seen within a month after a surgery in order to ensure that the surgery was successful, combined with the complete failure to conduct such follow-up, could also plausibly show that Dr. Osgood failed to act with the necessary degree of skill and care.[14]

_____

[14] It is true that Milliner eventually refused to be seen by Dr. Osgood, and thus Dr. Osgood cannot be entirely faulted for his lack of follow-up. But according to the complaint, Milliner did not object to being seen by Dr. Osgood until several months had passed without any follow-up. It is reasonable to infer that, during the intervening months, Dr. Osgood's failure to see Milliner was due to Dr. Osgood's lack of care rather

Finally, causation is sufficiently alleged because Milliner's temporary paralysis occurred as a direct result of the botched surgery. And it can reasonably be inferred that at least some of the pain and medical complications suffered by Milliner were the result of Dr. Osgood's failure to conduct timely follow-up. In sum, Milliner has stated a claim for malpractice against Dr. Osgood.

2. Negligence

Milliner's complaint fails to allege that Dr. Osgood committed any acts that raise issues within the common knowledge of a lay-person. Instead, his two primary allegations are that Dr. Osgood's surgery was flawed and that his follow-up was deficient. Both of these alleged failures raise questions involving medical judgment, and thus Milliner's negligence claim against Dr. Osgood must be dismissed.

**B. Altoona Hospital**

1. Corporate liability[15]

_____

than to Milliner's objection to further treatment from Dr. Osgood.

[15] As noted above, the Pennsylvania Supreme Court has identified four separate duties that a hospital owes to its patients:

(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

_Thompson_, 594 A.2d at 707. As discussed above, _see supra_ note 11, the court construes this claim (in Count VIII) as being identical to the "negligence" claim alleged in Count X. Accordingly, Altoona Hospital's motion to dismiss will be granted as to Count X.

Dr. Osgood's defective surgery was performed at Altoona Hospital. Compl. ¶ 44.

Milliner makes various conclusory allegations about Altoona Hospital's failure to (1)

develop adequate "protocols and systems," (2) properly supervise physicians, and (3)

ensure that its physicians were properly trained. These bare allegations, without more, are

insufficient to state a claim for corporate negligence against Altoona Hospital.[16]

### 2. Medical malpractice – vicarious liability

Milliner's complaint is, however, sufficient to state a claim that Altoona Hospital

is vicariously liable for the alleged malpractice committed by Dr. Osgood. Milliner has

alleged that Dr. Osgood "was employed by, was a consultant of, or was held out as an

employee of Defendant Altoona Hospital and acted within the scope of said employment

or consultancy." Compl. ¶ 125. Moreover, Milliner alleges that, "Defendant Altoona

Hospital exercised control over Dr. Osgood's practice of medicine." Compl. ¶ 126.

Taking these allegations as true, and in the context of the complaint as a whole, Milliner

has presented a plausible claim that Altoona Hospital is vicariously liable for any

---

[16] The court recognizes that the allegations against PHS—which the court found sufficient to state a claim for corporate negligence—are similarly sparse. However, as discussed above, in light of the allegations that Milliner received grossly inadequate post-surgical treatment—in part because he was transferred to an institution that was ill-equipped to handle such treatment—the complaint sufficiently alleges corporate negligence against PHS. Specifically, under *Thompson*, PHS can be found liable for a failure to "formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients." *Thompson*, 594 A.2d at 707. In contrast, the allegations against Altoona Hospital are solely premised on Dr. Osgood's allegedly deficient performance, and thus are insufficient to state a claim for corporate liability.

malpractice committed by Dr. Osgood.

**V.**

For the foregoing reasons, the accompanying order will include the following rulings:

(1) The Medical Defendants' motion to dismiss will be granted in part and denied in part. The federal claims will be dismissed, without prejudice, as to Machak and Drs. Stefanic and Nwosu, but will remain as to Dr. Zaro. Moreover, the state law claims remain as to each individual Medical Defendant. The negligence claim against PHS will be dismissed without prejudice, but the deliberate indifference, corporate liability, and vicarious liability claims will remain.

(2) The Administrative Defendants' motion to dismiss will be granted, and the complaint will be dismissed without prejudice as to those defendants.

(3) The Altoona Defendants' motion to dismiss will be granted in part and denied in part. The negligence claim will be dismissed without prejudice as to Dr. Osgood, but the malpractice claim will remain. The corporate liability and negligence claims against Altoona Hospital will be dismissed without prejudice, but the vicarious liability claim will remain.