IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN MILLINER | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. 08-4905 |
| | : | |
| DAVID DIGUGLIELMO, *et al.* | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM OPINION AND ORDER

Rufe, J.                                                                January 31, 2014

Plaintiff, John Milliner, filed suit against various employees and entities associated with the Pennsylvania prison system, alleging that he received inadequate medical care while incarcerated, eventually leading to temporary paralysis and on-going medical problems.  He has also sued a surgeon outside of the prison system who operated upon him.  Certain Defendants have moved for summary judgment.

## I.   BACKGROUND

The case has a lengthy procedural history. Counsel was appointed to represent Plaintiff, and the parties are proceeding pursuant to the allegations contained in the Fourth Amended Complaint.[1]  For purposes of summary judgment, the parties have stipulated to the following facts.  At all relevant times, Plaintiff was incarcerated at State Correctional Institution ("SCI") Graterford.  Defendant Prison Health Services, Inc. ("PHS") is a private entity that provided medical services to inmates in Pennsylvania state correctional facilities.[2]  Plaintiff was injured on October 14, 2006, when he fell from the top bunk bed in his cell, injuring his right ankle, right

---

[1] The late Honorable Louis Pollak, to whom this case was previously assigned, ruled on several motions to dismiss earlier complaints.

[2] PHS is now known as Corizon Health, Inc.

knee, and lower back.  Plaintiff submitted a sick call request on October 16, 2006, and was seen

on October 18, 2006, by Defendant Raymond Machak, a physician's assistant employed by PHS.

Mr. Machak saw Plaintiff again on October 27, 2006, and at Plaintiff's request placed Plaintiff

on the list to be seen by a doctor.  Plaintiff was seen on November 6, 2006, by Defendant John

Zaro, D.O., a staff physician at Graterford employed by PHS.  During December 2006 and

January 2007, Plaintiff was seen several times by either Mr. Machak or Dr. Zaro.  On January 24,

2007, Plaintiff reported that he could not move his right arm, and was seen that day by Defendant

Caleb, Nwosu, D.O., a staff physician at Graterford employed by PHS.  Plaintiff underwent an x-

ray of his cervical spine the next day, and was seen by a doctor at a chronic care clinic on March

27, 2007, and received physical therapy during April 2007.  On May 30, 2007, Plaintiff

underwent an MRI of the cervical spine, which was approved by Defendant Richard Stefanic,

M.D., the medical director at Graterford employed by PHS.  On September 27, 2007, Defendant

Carroll Osgood, M.D., a neurosurgeon (who is not employed by PHS or the Department of

Corrections ("DOC")) performed cervical spine surgery on Plaintiff at Altoona Hospital.[3]

Plaintiff was transferred to SCI-Smithfield, and then to SCI-Laurel Highlands, where he

remained until January 15, 2008, when he returned to Graterford, where Dr. Nwosu

recommended physical therapy and assignment to a single bunk cell.  Plaintiff received physical

therapy until May 27, 2008.  After another MRI on September 16, 2008, Plaintiff was transferred

to SCI-Smithfield, and scheduled for a post-surgical follow-up with Dr. Osgood, but Plaintiff

refused to see Dr. Osgood.  Plaintiff then was transferred back to Graterford.  During the events

described above, Plaintiff filed several grievances, which were denied by Defendant Myron

---

[3] Dr. Osgood has not moved for summary judgment.

Stanishefski, the Health Care Administrator at Graterford and an employee of the DOC.  The Court will set forth additional facts as necessary in discussing the individual arguments of Defendants.

The Fourth Amended Complaint alleges claims for violation of Plaintiff's constitutional rights as secured by 42 U.S.C. § 1983 against Defendants Stanifsheski, Zaro, and PHS, and claims for medical malpractice and negligence against Defendants Machak, Stefanic, Nwosu, Zaro, PHS, and Osgood.[4]

## II.    LEGAL STANDARDS

### A.    Summary Judgment

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5]  A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[6]  A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[7]

A party moving for summary judgment has the initial burden of supporting its motion by reference to admissible evidence[8] showing the absence of a genuine dispute of a material fact or

---

[4] Plaintiff also filed, but then dismissed claims against Altoona Hospital, where the surgery was performed.

[5] Fed. R. Civ. P. 56(a).

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[7] *Id.*

[8] *See Callahan v. A.E.V., Inc.,* 182 F.3d 237, 252 n.11 (3d Cir. 1999).

showing that there is insufficient admissible evidence to support the fact.[9]  Once this burden has been met, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."[10]  In considering a summary judgment motion, the Court does not weigh the evidence or make credibility determinations; "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [its] favor."[11]

        **B.**        **Eighth Amendment Claims**

To establish deliberate indifference to a serious medical need in violation of the Eighth Amendment to the United States Constitution, a plaintiff must develop a sufficient evidentiary record upon which a reasonable jury could conclude that defendants knowingly acted or failed to act in a manner that presented a substantial risk of harm.[12]  To establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate "a violation of a right protected by the Constitution . . . committed by a person acting under the color of state law."[13]  Where, as here, private entities contract with municipalities to provide services to prison inmates, those entities, and their employees, act "under color of state law."[14]  It is well settled that an individual defendant in a

---

[9] *See* Fed. R. Civ. P. 56(c).

[10] *Berckeley Inv. Grp. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir. 2006).

[11] *Anderson*, 477 U.S. at 255.

[12]  *Farmer v. Brennan*, 511 U.S. 825 (1994); *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

[13] *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 580-81 (3d Cir. 2003).

[14] *See West v. Atkins*, 487 U.S. 42, 54 (1988) (physician under contract to provide medical services at prison acted under color of state law); *see also Morgan-Mapp v. George W. Hill Corr. Facility,* No. 07-2949, 2008 WL 4211699, at *15 (E.D. Pa. Sept. 12, 2008) (private companies that contract with prisons act under color of state law for purposes of § 1983).

civil rights action "must have personal involvement in the alleged wrongs,"[15] which "can be shown through allegations of personal direction or of actual knowledge [of] and acquiescence" to a subordinate's violation of a plaintiff's constitutional rights.[16]

The "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment. . . . [W]hether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care . . . deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."[17] However, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."[18]  "Claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'"[19]  "Deliberate indifference requires a sufficiently culpable state of mind,[20] and may be found where prison officials "1) deny reasonable requests for medical treatment, and the denial exposes the inmate to undue suffering or the threat of tangible residual injury, 2) delay necessary medical treatment for non-medical reasons, or 3) prevent an inmate from receiving recommended treatment for serious medical

---

[15] *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).  *See also Durmer v. O'Carroll*, 991 F.2d 64, 70 n.14 (3d Cir. 1993) (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981)) ("Respondeat superior is, of course, not an acceptable basis for liability under § 1983.").

[16] *Rode*, 845 F.2d at 1207.

[17] *Estelle,* 429 U.S. at 104-05 (citing *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)) (internal punctuation omitted).

[18] *Id.* at 106.

[19] *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

[20] *Whooten v. Bussanich*, 248 F. App'x 324, 326 (3d Cir. 2007).

needs, or deny access to a physician capable of evaluating the need for treatment."[21]  Plaintiff

asserts Eighth Amendment claims against Moving Defendants Dr. Zaro, PHS, and Mr.

Stanishefski.

### B.      Pennsylvania Medical Malpractice and Negligence Claims

A claim for medical malpractice under Pennsylvania law requires a plaintiff to establish

"a duty owed by the physician to the patient, a breach of that duty by the physician, that the

breach was the proximate cause of the harm suffered, and the damages suffered were a direct

result of harm."[22]  In most cases, a medical expert must testify as to the elements of duty, breach,

and causation.[23]   A negligence claim does not require such expert testimony; in determining

whether the claim sounds in negligence or medical malpractice, the Court must determine "(1)

whether the claim pertains to an action that occurred within the course of a professional

relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of

common knowledge and experience."[24]  Plaintiff has asserted medical malpractice claims against

Moving Defendants Dr. Stefanic, Dr. Nwosu, and Mr. Machak, negligence claims against

Moving Defendants Dr. Stefanic and Mr. Stanishefski, and a corporate negligence and vicarious

liability claim against Moving Defendant PHS.

--------

[21]  *Id.* at 326-27.

[22]  *Hightower-Warren v. Silk*, 698 A.2d 52, 54 (Pa. 1997).

[23]  *Quinby v. Plumsteadville Family Practice, Inc.*, 907 A.2d 1061, 1070 (Pa. 2006).   *See also* Pa. R. Civ. P. 1042.3(a)(3) (requiring a certificate of merit).

[24]  *Smith v. Friends Hosp.*, 928 A.2d 1072, 1075 (Pa. Super. Ct. 2007).

## III.    DISCUSSION

### A.    Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA")[25] was enacted in part "to reduce the quantity . . . of prisoner suits," one component of which is an 'invigorated' exhaustion provision, § 1997e(a),"[26] which provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.[27]

Under § 1997e(a), exhaustion is mandatory.[28]  Prisoners must exhaust all "available" remedies before filing suit challenging any prison condition.[29]  Plaintiff cannot proceed to trial on the § 1983 claims unless he properly sought remedies through the prison grievance system even if the grievance system cannot afford him the relief he seeks.[30]   Dr. Zaro and PHS argue that Plaintiff failed to exhaust his administrative remedies against them.[31]  Plaintiff's grievances do, however, state that since his injury he had been arbitrarily denied adequate medical treatment and care. The initial level grievance specifically referred to Dr. Zaro and other medical and nursing staff, and

---

[25]  42 U.S.C. § 1997e *et seq.*

[26]  *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

[27]  42 U.S.C. § 1997e(a).

[28]   *Porter,* 534 U.S. at 85.

[29]  *Id.*

[30]  *Id.*

[31]  Although Mr. Stanishefski raised the issue of exhaustion in his motion for summary judgment, he did not develop a basis for this argument in his reply and the Court deems it waived.

7

Plaintiff filed the required appeals.[32]   A reasonable reading of the grievances is that Plaintiff is

complaining that Dr. Zaro is one of the individuals denying him care, and because the Court finds

that Plaintiff has exhausted his administrative remedies, it will deny summary judgment on this

basis.  PHS fails to cite any authority for the proposition that an inmate must name PHS itself,

rather than its employees, in a grievance in order to exhaust administrative remedies, and

therefore the Court will consider the merits of the claim against PHS as well.

### B.      Substantive Claims

#### 1.      *Eighth Amendment Claims against Dr. Zaro*

The parties largely agree that Dr. Zaro's treatment of Plaintiff focused on Plaintiff's high

blood pressure and related conditions, not his back pain. Dr. Zaro contends that his priority was

preventing Plaintiff from suffering a stroke[33] and that he understood others to be addressing

Plaintiff's back problems, including Dr. Nwosu.  Plaintiff acknowledges that he saw Dr. Nwosu

for complaints about his severe neck pain and loss of mobility in his right arm, but argues that Dr.

Zaro did not ask him about these issues and did not review Dr. Nwosu's notes on Plaintiff's

care.[34]  Dr. Zaro testified that his "primary goal [was] to get this guy's blood pressure under

control, save his kidney and save his heart and vascular system."[35]  This evidence does not support

that Dr. Zaro was deliberately indifferent to Plaintiff's serious medical needs, or that Dr. Zaro had

---

[32] Doc. No. 135-09.

[33] Zaro Dep. at 80.

[34] Plf.'s Opp. Summ. J. at 18.  The Court notes that Dr. Zaro disputes that Plaintiff ever complained of neck or back pain to him at the operative time, Zaro Dep. at 113, although Plaintiff had complained of recurrent back pain.  Zaro Dep. at 79.

[35] Zaro Dep. at 81.

a subjective awareness of any untreated injuries.[36]   The evidence instead shows that Dr. Zaro was

aware that Dr. Nwosu and another physician were addressing Plaintiff's complaints regarding his

neck and back condition, and Dr. Zaro was himself treating unrelated but serious medical needs of

Plaintiff.[37]   Whether Dr. Zaro should have reviewed all of Plaintiff's treatment records is an issue

relevant to malpractice claims, but there is no evidence that the other physicians expected Dr.

Zaro to take any action with regard to the medical needs at issue.[38]   Under these circumstances, a

reasonable factfinder could not conclude that Dr. Zaro demonstrated deliberate indifference to or

otherwise violated Plaintiff's rights under the Eighth Amendment.[39]

### 2.  *Medical Malpractice Claims against Dr. Zaro, Dr. Stefanic, and Dr. Nwosu*

The physician Defendants argue that Plaintiff's expert witness, Dr. Black, is not qualified

to testify as an expert against Dr. Stefanic, Dr. Zaro, or Dr. Nwosu because Dr. Black specializes

in neurosurgery, and the Defendant doctors are board certified in family practice.

Pennsylvania's Medical Care Availability and Reduction of Error Act ("MCARE") sets

---

[36] *Farmer v. Brennan*, 511 U.S. 825, 848 (1994).

[37] Zaro Dep. at 128-30.

[38] *Compare Morton v. City of Phila.,* No. 09-4877, 2011 WL 536545, at *5 (E.D. Pa. Feb. 15, 2011) (concerning a physician's failure to follow-up on a referral).

[39] Plaintiff relies upon the decision of *Turner v. Kirsch*, No. 08-2005, 2011 WL 1430300 (E.D. Pa. 2011), where the court denied summary judgment as to several physicians responsible for the plaintiff's care in prison. However, as to one of the physicians in that case, the court concluded that the plaintiff's claim "rest[ed] on his disagreement with the way in which [the physician] participated in his care . . . .  There is insufficient evidence to conclude that, during [the physician's] three evaluations of Plaintiff during this period, he refused to provide Plaintiff medical care, delayed his treatment for non-medical reasons, or prevented him from receiving recommended care." *Id.* at * 7.  The same is true of Dr. Zaro in this case.

forth the standard for expert witnesses in medical malpractice cases.[40]   The Pennsylvania

Supreme Court has explained the effect of the statute:

> [P]ursuant to Section 512, to testify on a medical matter in a medical malpractice action against a defendant physician, an expert witness must be a licensed and active, or a recently retired, physician. In addition, in order to render an opinion as to the applicable standard of care, the expert witness must be substantially familiar with the standard of care for the specific care in question. Furthermore, the expert witness must practice in the same subspecialty as the defendant physician, or in a subspecialty with a substantially similar standard of care for the specific care at issue ("same specialty requirement"). Finally, if the defendant physician is board certified, the expert witness must be board certified by the same or a similar board ("same board certification requirement"). Importantly, the expert witness must meet all of these statutory requirements in order to be competent to testify. However, there is an exception to the same specialty and same board-certification requirements: if a court finds that an expert witness has sufficient training, experience, and knowledge to testify as to the applicable standard of care, as a result of active involvement in the defendant physician's subspecialty or in a related field of medicine, then the court may waive the same specialty and same

---

[40] 40 P.S. 1303.512.  In relevant part, the statute provides that:

c) Standard of care.—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

* * * * * *

(e) Otherwise adequate training, experience and knowledge.—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512.

board certification requirements.[41]

As Dr. Black is not certified in the same specialty as the Defendant doctors, he must have "active involvement in the defendant physician's subspecialty or a related field of medicine."[42] Defendants argue that as a neurosurgeon, Dr. Black has not applied the standard of care or knowledge expected of a family practitioner, but that Dr. Black wrongly attempts to hold Dr. Stefanic, Dr. Zaro, and Dr. Nwosu to the standard of care of a neurosurgeon.  The Court has carefully reviewed the expert opinions of Dr. Black, and finds that Dr. Black specifically identifies delays in ordering an MRI and a neurosurgical consultation, identifies these delays as reducing "the expected benefit of surgical decompression," and opines that the medical care "likely caused neurological injury and unnecessary pain."[43]  The expert reports address more than the neurosurgery performed by Dr. Osgood, but also assess the review of symptoms that lead to the referral to a neurosurgeon.  Therefore, although the reports could have been more detailed with regard to each individual physician Defendant, the Court finds for purposes of summary judgment that a neurosurgeon may be competent to testify as to the standard of care applicable to when a family practitioner orders or recommends a consultation with a neurosurgeon and that Dr. Black's opinion was adequately supported in this case.[44]

---

[41] *Vicari v. Spiegel*, 989 A.2d 1277, 1281 (Pa. 2010) (emphasis omitted).

[42] *Id.*

[43] Ex. 131-12.

[44] *See Renna v. Schadt*, 64 A.3d 658, 666 (Pa. Super. Ct. 2013) (holding that the decision in *Vicari* recognized that "fields of medicine may be related with respect to specific issues of care, and wholly unrelated with respect to others").  This ruling is without prejudice to the Defendants' ability to challenge Dr. Black's opinion at trial.

### 3. *Medical Malpractice Claims against Mr. Machak*

Although the evidence is sufficient to permit the medical malpractice claims against the physicians to proceed, the same is not true of the claims against the physician's assistant, Mr. Machak. Plaintiff's opposition to summary judgment barely mentions Mr. Machak. The only evidence cited is that Plaintiff first saw Mr. Machak four days after the fall, at which time Mr. Machak prescribed pain medication which Plaintiff testified afforded him no relief,[45] and that this treatment continued when Plaintiff was unable to see a physician.[46] Plaintiff then saw Mr. Machak again on May 14, 2008, after the surgery, but asserts that Mr. Machak failed to note that Plaintiff had not received a post-surgical consultation.[47] The Court finds this evidence insufficient to establish a medical malpractice claim against Mr. Machak, especially as the expert opinions of Dr. Black do not address Mr. Machak's conduct at all. Nothing in Dr. Black's opinions indicate that he has any basis for evaluating the conduct of physician's assistants or indeed that he has done so in this case.[48] Therefore, the record does not permit a factfinder to determine that Mr. Machak breached a standard of care he owed to Plaintiff and the motion for summary judgment will be granted as to Mr. Machak.

---

[45] Milliner Dep. at 43.

[46] Milliner Dep. at 297-98.

[47] Milliner Ex. 153.

[48] *Yacoub v. Lehigh Valley Medical Assocs., P.C.*, 805 A.2d 579, 592 (Pa. Super. Ct. 2002) . Nor is there any evidence that Dr. Black interacts regularly with physician's assistants. *See Rettger v. UPMC Shadyside*, 991 A.2d 915, 930 (Pa. Super. Ct. 2010) (neurosurgeon who interacted on an ongoing basis with nurses in a hospital setting could testify as to expectations of a neurosurgical nurse).

### 4.    *Claims against PHS*[49]

Plaintiff alleges that policies of PHS resulted in a delay in providing appropriate treatment to Plaintiff before and after surgery and a delay in recommending that Plaintiff be placed in a single-bunk cell.[50]   First, Plaintiff asserts that PHS has a policy of scheduling appointments for specialty care as "late as possible."  As evidence to support this claim, Plaintiff cites the applicable review policy, which requires approval within seven working days from a request for a specialty referral, and which allows 60 days for the performance of outside services.[51]  Plaintiff argues that the referral for his neurosurgical consultation took 56 days and, once it was determined that surgery was needed, another 50 days passed before the operation was performed; the referral for the neurosurgical follow-up took nine months, with an appointment scheduled 140 days later.[52] However, Plaintiff has not produced any evidence of a policy or custom by PHS to delay treatment; for example, there is no evidence that the 60-day time frame is intended as the target, instead of the maximum, time to arrange specialty services.  In short, although there is an argument to be made that Plaintiff would have benefitted from receiving neurosurgical treatment more quickly, there is no evidence that the failure to make an earlier referral was the result of a constitutional dereliction of duty by PHS.

Although Plaintiff argues that PHS bears the cost of outside hospitalizations, and therefore

---

[49] As a preliminary matter, PHS seeks to limit those claims against it to those that were not dismissed by Judge Pollak in his ruling on the Third Amended Complaint.  However, as Judge Pollak's dismissal was without prejudice, and as PHS did not move to dismiss the Fourth Amended Complaint, the Court will consider those claims asserted against PHS in the Fourth Amended Complaint, which is the operative complaint.

[50] Fourth Am. Compl. at ¶ 94.

[51] Plff's Ex. L.

[52] Plffs. Omnibus Opp. Brief at 20.

has a motive to minimize such expenses, there is no evidence that any of the physicians acted pursuant to such a profit motive or were directed to do so.  Plaintiff has produced no evidence that PHS has a custom or policy whereby it refuses to make medically necessary housing recommendations.  At summary judgment, the Court must look to evidence, and Plaintiff has failed to produce the evidence necessary to sustain an Eighth Amendment claim against PHS.[53]

Plaintiff also asserts against PHS a claim for corporate negligence.  The Pennsylvania Supreme Court has "adopte[ed] as a theory of hospital liability the doctrine of corporate negligence or corporate liability under which the hospital is liable if it fails to uphold the proper standard of care owed its patient."[54]  A hospital has the following duties:

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.[55]

There is no dispute that PHS is subject to this standard.  Plaintiff has produced evidence that PHS and its medical director, Dr. Stefanic, have failed to establish polices (such as requiring physicians to review a patient's chart to determine what care is being provided by other physicians) to ensure patient care, which resulted in a failure to provide Plaintiff with well-coordinated medical care and led to delays in his treatment.  The Court finds that there is a material issue of disputed fact as to whether PHS complied with its duties as a medical provider,

---

[53] *See Carter v. Smith*, No. 08-279, 2011 WL 2313862, at * 21 (E.D. Pa. June 13, 2011).

[54] *Thompson v. Nason Hosp.*, 591 A.2d 703, 708 (Pa. 1991).

[55] *Id.* at 707 (citations omitted).

and the motion will be denied as to the corporate negligence claim.[56]

### 5. Claims against Mr. Stanishefski

Plaintiff asserts Eighth Amendment and negligence claims against Mr. Stanishefski, the health care administrator at SCI-Graterford, contending that Mr. Stanishefski was deliberately indifferent to Plaintiff's medical needs, particularly with regard to the grievance dated December 2, 2008. In that grievance Plaintiff complained that Dr. Stefanic had scheduled a consultation with Dr. Osgood against Plaintiff's wishes and that upon his return to Graterford after being transferred for the consultation (the consultation did not occur, however, as Plaintiff refused to see Dr. Osgood), Plaintiff was housed in a single cell with a double bunk, despite his need to be in a cell with a single bunk, which would allow Plaintiff to sit upright and alleviate some of his pain.[57] Mr. Stanishefski denied this grievance on the basis that "[f]ollow-up is usually done with the doctor who performed the surgery [and] Dr. Osgood does all of the neurosurgery for the [DOC]."[58] The denial of the grievance did not mention the single bunk complaint.[59] According to Plaintiff, Mr. Stanishefski's action manifested complete indifference to whether Plaintiff was provided appropriate medical care or housing, and that his failure to take action contributed to delays in treatment and caused Plaintiff unnecessary pain and suffering.

---

[56] The Court also finds sufficient evidence to allow the negligence claims against PHS and Dr. Stefanic to proceed with regard to the question of whether the failure to recommend single-bunk cell placement for Plaintiff was negligent.

[57] Plff. Ex. M.

[58] Plff. Ex. M.

[59] According to the uncontradicted evidence of Defendants, Plaintiff was in a cell with a double bunk from November 19, 2008 until December 9, 2008, when he was placed in a cell with a single bunk. Decl. of Stacey O'Mara at ¶ 3f.

When a prison administrator receives a grievance with regard to the treatment a prisoner receives under the care of medical professionals, "the Eighth Amendment does not require him or her to do more than 'review[] . . . [the prisoner's] complaints and verif[y] with the medical officials that [the prisoner] was receiving treatment.'"[60]  In the absence of any "evidence to suggest that . . . prison administrators[] had a reason to believe that the prison doctors were either mistreating or not treating"[61] Plaintiff, Mr. Stanishefski cannot be held liable under § 1983, even if the evidence suggests that there were problems with Plaintiff's course of treatment.[62]  Summary judgment will be granted on the Eighth Amendment claims against Mr. Stanishefski with regard to Plaintiff's medical treatment.[63]  Summary judgment will also be granted as to the issue of whether Plaintiff should have been placed in a single-bunk cell earlier than he was.  There is no evidence that Mr. Stanishefski had any responsibility to assign cells to prisoners, and Plaintiff has failed to produce evidence sufficient to show that Mr. Stanishefski had the requisite level of knowledge or personal involvement necessary to create liability pursuant to § 1983 with regard to the grievances filed by Plaintiff.[64]

---

[60] *Fantone v. Herbik*, 528 F. App'x 123, 128 (3d Cir. 2013) (quoting *Greeno v. Daley*, 414 F.3d 645, 655-56 (7th Cir. 2005)).

[61] *Id.*

[62] Plaintiff argues that the fact that the grievance was later upheld upon review by the prison superintendent supports his claims.  The Court cannot conclude that a successful appeal of a grievance imposes liability against the administrator who denied the grievance initially.

[63] In light of the case law with regard to the duties of prison administrators, the Court holds in the alternative that Mr. Stanishefski would be entitled to qualified immunity on this issue.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[64] It  is not always clear when Plaintiff contends that he should have been afforded such housing, *see* Milliner Dep. at 35.  However, Plaintiff testified in his deposition that he was not attempting to hold Mr. Stanishefski liable for a brief period after his return from SCI-Smithfield on December 2, 2008. Milliner Dep. at 34-35. The response to the summary judgment motion therefore improperly focuses on the grievance denied several days before Plaintiff received appropriate housing..

With regard to the negligence claim, Mr. Stanishefski argues first that it is barred by Pennsylvania's Political Subdivision Tort Claims Act, which grants immunity for certain claims against state entities.[65]  Plaintiff argues that claim comes within one of the waivers of  immunity, in this case, for "Medical-Professional Liability."[66]  The question is whether Mr. Stanishefski, as a prison health care administrator, falls within the "medical-professional" exception to the Sovereign Immunity Act.  The Pennsylvania courts have not provided a uniform answer to this question.[67]  Upon examining the record as to Mr. Stanishefski's duties, and considering that he is a licensed nurse in Pennsylvania,[68] the Court concludes that his duties were not purely administrative, but instead extended to ensuring that PHS's employees provided appropriate care to prisoners.

These duties included ensuring that "PHS fulfilled their contractual obligation, overseeing

---

[65]  42 Pa. C.S. §§ 8541-42.

[66]  The statute provides in relevant part:

> (b) Acts which may impose liability.-The following acts by a Commonwealth party may result in the imposition of liability on the Commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by:

> (2) Medical-professional liability.-Acts of health care employees of Commonwealth agency medical facilities or institutions or by a Commonwealth party who is a doctor, dentist, nurse or related health care personnel.

42 Pa. C.S. § 8522(b)(2).

[67]  *Compare Coats v. Showalter*, No. 1028 C.D. 2011 WL 10844923 (Pa. Commw. Ct. 2011) (holding, without substantial discussion, that the health care administrator at SCI-Huntingdon did not fall within the "medical professional" exception because her duties were entirely administrative and she did not directly provide medical care to inmates) *with Williams v. Syed*, 782 A.2d 1090 (Pa. Commw. Ct. 2001) (holding, without examining her job duties, that the health care administrator at SCI-Pittsburgh fell within the "medical professional" exception) *and Wareham v. Jeffes*, 564 A.2d 1314, 1324 (Pa. Commw. Ct. 1989) (holding that a health care administrator fell within the "medical professional" exception because "his function as chief health care administrator encompassed providing health care services to inmates pursuant to physicians' orders").

[68]  Stanishefski Dep. at 18.

17

the nursing, medical and dental records departments and responding to grievances assigned [] by the grievance coordinator,"[69] ensuring that all inmates who signed up for sick call were seen by medical staff, and ensuring that medical vendors such as PHS "would provide the required hours, that their documentation was proper and in the format of what the [DOC] required."[70]   To this end, Mr. Stanishefski monitored a database into which PHS logged all patient information.[71]  Mr. Stanishefski also would discuss inmate medical care with PHS physicians if necessary.[72]  With regard to Plaintiff's care, Mr. Stanishefski would have reviewed Plaintiff's medical records in responding to his grievance in which Plaintiff complained that Dr. Zaro had not helped him and in which Plaintiff sought additional medical attention.[73]  The Court therefore finds that Mr. Stanishefski acted in such a way to qualify as "related health care personnel" for purposes of the medical professional exception.[74]

In order to establish negligence, Plaintiff is required to prove "(1) a legal duty or obligation to conform to a certain standard of conduct; (2) a failure to conform to that standard; (3) a reasonably close causal connection between the conduct and resulting injury; and (4) actual damage or loss."[75]  Plaintiff has not produced sufficient evidence to establish that there was a causal connection between his injuries and any alleged action or inaction on the part of Mr.

---

[69] Stanishefski Dep at 47.

[70] Stanishefski Dep. at 36.

[71] Stanishefski Dep. at 38.

[72] Stanishefski Dep. at 51-55.

[73] Stanishefski Dep at 126, 128.

[74] *Wareham*, 564 A.2d at 1319, 1324.

[75] *Williams*, 782 A.2d 1093-94

Stanishefski, instead of the doctors who were providing him with medical treatment.  The Court will grant the motion for summary judgment as to Mr. Stanishefski.

**IV.    CONCLUSION**

The motions for summary judgment will be granted as to all claims against Mr. Machak and Mr. Stanishefski, and as to the § 1983 claims as to all Defendants.  The motions will be otherwise denied.

An order will be entered.